# EXHIBIT C

JEFFERSON SMURFIT CORPORATION (U.S.)
and STONE CONTAINER CORPORATION
MOTOR CONTRACT CARRIER AGREEMENT NUMBER _0093_

THIS AGREEMENT made this 1st day of April, 2000, by and between

**SYSTEM FREIGHT, INC.**                            SCAC _SYFI_

having offices at

P.O. Box 554
Jamesburg, NJ 08831

hereinafter called "CARRIER" and Jefferson Smurfit Corporation (U.S.) and Stone Container Corporation, Delaware Corporations, having offices at 401 Alton Street, Alton, Illinois 62002, for itself and any of its subsidiaries and affiliates (Exhibit B) hereinafter called "SHIPPER".

### PREAMBLE

Carrier represents it is a "motor carrier" operating under authority granted by the Interstate Commerce Commission ("ICC"), U.S. Department of Transportation (D.O.T.), and certain state regulatory agencies, and is entering into this agreement pursuant of the provisions of 49 USC S14101 (b), to provide transportation services on behalf of Shipper in interstate and intrastate commerce and is fit, willing, and able to provide the services contemplated by this Agreement. Carrier further represents and warrants it is presently in compliance and shall at all times during the term of this Agreement remain in compliance with all applicable laws and ordinances of all governments (Federal, State and Local) having jurisdiction over any of its operations or the services to be provided under this Agreement. Carrier represents that the services provided under this Agreement are designed to meet the distinct needs of Shipper. Carrier and Shipper in consideration of the foregoing and of the mutual promises herein, agree as follows:

1) Shipper agrees to tender or cause to be tendered to Carrier, shipments of the commodities described in the Exhibit(s) attached hereto and made a part hereof as if set forth in the body of this Agreement or in subsequent Exhibit(s) to this Agreement which may be issued and made a part of this Agreement, provided that such subsequent Exhibit(s) are dated and signed by both parties.

2) Carrier agrees to maintain, operate, and keep in good operating order a sufficient and adequate amount of equipment to provide the prompt and efficient delivery of goods upon reasonable request by Shipper.

3) The services to be provided under this Agreement shall be performed solely by employees and/or agents of Carrier and Shipper shall have no control or responsibility with respect to such persons. Carrier shall perform the services and other obligations under this Agreement as an independent contractor and not as an agent or employee of Shipper. The hiring, terms of employment, discharge, and other conditions respecting the employees and/or agents of Carrier are under the sole and exclusive control and responsibility of Carrier.

4) Carrier agrees to transport shipments between points shown on the Exhibit(s) without delay caused by anything within Carrier's control at the rates and charges specified in the Exhibit(s). Rates and charges specified in the Exhibit(s) will remain in effect for a minimum of twelve (12) months from the date of signing, unless otherwise agreed to by both parties. However, the Exhibit(s) may be amended, provided that revised Exhibit(s) are dated and signed by both parties. Such revisions to the Exhibit(s) shall be identified as "First Revised Exhibit A", "Second Revised Exhibit A", etc.

Initialed by: _____
Date: _____

1

5) Carrier shall be liable for loss or delay of, or damage to property as and to the same extent that liability is imposed on motor carriers under the provision of 49 USC S14706 unless otherwise agreed to in writing, as amended, and the common law of the United States, and any claim or action at law for such loss, damage or delay shall be governed by the provisions of the said 49 USC of S14706 and common law; provided, however, that if any such loss, damage or delay is due in whole or in part to the negligence of Shipper, its employees or agents, Carrier shall be liable only for such portion thereof as is not due to such negligence. The provisions of this section shall survive the termination, expiration or cancellation of this Agreement.

6) Carrier agrees that it will, at its own expense, at all times carry cargo insurance, automobile liability insurance covering bodily injury and property damage and Worker's Compensation and Employer's Liability Insurance and Comprehensive General Liability Insurance. Such insurance shall name Jefferson Smurfit Corporation (U.S.) and Stone Container Corporation, its subsidiaries and affiliates as an additional insured, and shall waive subrogation in favor of Jefferson Smurfit Corporation (U.S.) and Stone Container Corporation, its subsidiaries and affiliates. Such insurance shall be subject to Shipper's approval as to form and limits and written in Companies satisfactory to Shipper. The insurance companies providing the required coverages shall have a Best rating of "A" or better. In no event shall the limits of such insurance be less than the minimum amount specified in the applicable regulations to the state public utility commission or the or U.S. Department of Transportation, and in no event shall such limits be less than the following:

| | |
|---|---|
| Comprehensive General Liability Insurance<br>Covering Bodily Injury and Property Damage<br>Combined single limits, per occurrence | $1 Million |
| Auto Liability Insurance<br>Covering Bodily and Property Damage<br>Combined single limit, per occurrence | $1 Million |
| Worker's Compensation<br>Employers Liability<br>Cargo Liability | Statutory Limits<br>$ 500,000<br>$ 50,000 |

Evidence of such insurance shall be given to Shipper by a certificate or conformed copy of each policy and shall provide for 30 days prior notice to Shipper of material changes in or termination of the policies. Carrier shall require each subcontractor or agent performing transportation service on behalf of Carrier hereunder to be covered by insurance of the same character and in the same amounts as specified above. Carrier also agrees that it will protect, defend, hold harmless and indemnify Shipper from and against any and all claims, action or causes of action which may at any time be brought against Shipper because of death, bodily injury or property damage sustained by others because of the operation, maintenance, or use of any motor vehicles or equipment by or on behalf of Carrier.

7) Carrier shall indemnify and hold harmless Shipper from and against all loss, damage, fines, expenses, actions and claims for injury to persons (including injury resulting in death), including but not limited to Carrier's employees, and damage to property, including but not limited to Carrier's property, where such loss, damage, fines, expenses, actions and claims for injury is caused by Carrier's breach of this Agreement, acts or omissions of Carrier, its agents or employees, and arising out of or in connection with Carrier's duties and responsibilities as provided in this Agreement, unless such injury or damage is caused by the negligence of Shipper, it agents or employees. The indemnity herein provided shall include but shall not be limited to all costs, expenses and attorney's fees incurred or payable by Shipper in settling such loss, damage, fines, expenses, actions and claims or in investigating or defending against the same.

Initialed by: _____
Date: _____

2

8) Neither party shall be liable for delay or failure to perform in whole or in part, by reason of contingencies beyond the reasonable control of the party affected, whether herein specifically enumerated or not. These contingencies include, among others, acts of God, acts of war, revolutions, riots, acts of public enemies, fires, explosions, breakdowns of plant, strikes, lockouts, labor disputes, casualties or accidents, earthquakes, floods, cyclones, tornadoes, hurricanes or other windstorms, or by reason of any law, order, proclamation, regulations, ordinance, demand, requisition or requirement or any other act of any governmental authority, local, state, federal, or any other cause whatsoever, whether similar or dissimilar to those enumerated. However, the party so affected shall promptly give notice to the other party whenever a contingency or other act becomes reasonably foreseeable, shall use its best efforts to overcome the effects of the contingency as promptly as possible and promptly give notice to the other party of the cessation of the contingency. Neither party, however, shall be required to resolve a strike, lockout or other labor problem in a manner which it alone does not deem proper and advisable.

9) This Agreement, including the Exhibit(s), supersedes all prior Agreements with respect to this subject matter. Amendments to this Agreement must be in writing, described as an Amendment to this Agreement, and must be duly executed by both parties.

10) This Agreement shall be binding upon and shall inure to the benefit of both parties and their respective successors and permitted assigns. Neither party shall assign this Agreement without the written consent of the other.

11) Mileage to be used in connection with rates and charges contained in this Agreement shall be determined by and as provided in the Rand McNally "Mile Maker", Guide 17, including supplements thereto and subsequent issues thereof in effect on date of shipment.

12) If the Exhibit(s) include a stop charge, shipments subject to rates based on mileage may be stopped in transit to complete loading or to partially unload. The rate to apply shall be the rate applicable from point of origin to point of final destination. The mileage to be used in calculating freight charges shall be the mileage applicable from point of origin to point of final destination via the stop-off point or points. The charge for each stop in transit, excluding the initial stop for loading and the final stop for unloading, shall be specified in the Exhibit(s).

13) Additional terms and conditions of the Agreement are set forth in the Exhibit(s). In the event of a conflict between the provisions of this Agreement and the provisions in the Exhibit(s), the provisions in the Exhibit(s) shall apply.

14) Any communication relative to this Agreement shall be confirmed in writing and shall be deemed sufficient given:

   a. Upon facsimile (fax) transmission of such communication; or

   b. Upon the date received by the intended recipient if delivered by hand; or

   c. If the sender so elects, upon the date deposited in the United States mail, certified with return receipt requested, postage prepaid, addressed to the intended recipient, as follows:

      - P.O. Box 544, Jamesburg, NJ 08831

      - To Shipper: Corporate Traffic, 401 Alton Street, Alton, Illinois 62002.

      - To other address or addresses as either party may hereinafter designate in writing.

Initialed by: _____
Date: _____

3

15) The provisions of Section 14706 Title 49, U.S. Code, as the same may be amended from time to time, shall be made a part hereof as if set forth in the body of this Agreement and shall be applied to this Agreement in the same manner and shall have the same force and effect as if the provisions of said Section 14706 were applicable to transportation hereunder. Nothing in this provision shall change the relationship of the parties, i.e., the relationship is that of Shipper and motor carrier.

16) Shipments tendered to Carrier by Shipper under this Agreement shall be accompanied by a bill of lading and/or billing instructions. In the event of a conflict between the terms of this Agreement and the conditions contained in the bill of lading and/or billing instructions, the terms of this Agreement shall govern.

17) This Agreement shall commence on the date first above written and remain in effect for a period of one year and shall continue for successive one year periods thereafter subject, however, to the right of either party to terminate the same at any time during the original or any extended term upon giving to the other not less than sixty (60) days prior written notice.

18) Carrier will bill Shipper and Shipper will make every effort to pay Carrier within fifteen (15) days after receipt of bill for transportation services herein provided, at the rates and charges, and subject to the rules, if any, set forth in the Exhibit(s).

19) Except as and to the extent required by law, or as may be necessary for the performance of their duties hereunder, neither party may disclose any term or provision of this Agreement to a non-signature party without the express written consent of the other party. However, Shipper may disclose the terms and provisions of this Agreement to an auditor for the purpose of assessing the accuracy of the freight charges without the express written consent of Carrier, provided that the auditor agrees to protect the confidentiality of this Agreement.

20) If any one or more of the following occurs with respect to one party, the other party may terminate this Agreement by giving written notice to such party: such party generally does not pay its debts; it becomes insolvent; it makes a deed of trust or assignment for the benefit of creditors; it undertakes any action or other proceedings seeking relief as a debtor or otherwise under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors or any such action or proceeding is brought against it; it seeks appointment of a receiver, trustee, custodian or similar official for it or for all or any substantial part of its property or such a receiver, trustee, custodian, or similar official is appointed, whether sought by it or not; or the other party has reasonable ground for insecurity as to its ability to perform its obligations hereunder and it is unable to provide the other party with adequate assurance in writing of its ability to perform hereunder within ten (10) days.

21) Carrier warrants that it has not previously transported and, while this Agreement is in effect, will not hereafter transport any goods for Shipper using any equipment that has been used to handle, store or transport, whether in bulk or in containers, any (i) garbage or other municipal, residential, institutional, commercial or industrial wastes (other than sorted commercial grades of uncontaminated waste paper); (ii) infectious, unsanitary or putrescible wastes or other materials; (iii) hazardous or toxic wastes as defined in the Federal Resource Conservation and Recovery Act, as amended, in regulations adopted by the United States Environmental Protection Agency, or in any other applicable laws or regulations; (iv) hazardous materials as defined in the Federal Hazardous Materials Transportation Act, as amended, or in regulations adopted by the Federal Department of Transportation; or (v) materials that may result in contamination or adulteration of the equipment or of Shipper's goods or that may affect their odor or other characteristics.

22) Carrier shall retain a copy of this Agreement at all times during the term of this Agreement and for a period of three (3) years thereafter, and shall make same available to the Interstate Commerce Commission or U.S. Department of Transportation upon request.

Initialed by: _NC_
Date: _4/12/7_

4

23) Claims for overcharges and undercharges must be filed within 180 days from the date of shipments and failure to observe this time requirement shall forever bar any claim or legal action to receive such overpayments or underpayments.

24) In the event of a conflict, the provisions of this contract will take precedence over those contained elsewhere.

25) Carrier covenants and agrees that during the term hereof and for a period of one (1) year thereafter, it or, if an individual, he will not solicit and will not, in any manner, directly or indirectly, without the written consent of Shipper, participate as a principal, agent, director, stockholder, employee, consultant, partner or individual proprietor of any business which solicits the recyclables hauling business, the purchase of recyclable materials or any other business of any of the customers, prospective customers, suppliers or prospective suppliers of Shipper.

26) Carrier acknowledges that during the course of providing services on behalf of the Shipper, the Shipper may disclose either orally or in writing to Carrier confidential or proprietary information relating to its business, operations, suppliers or customers, or Carrier may be exposed to such confidential or proprietary information by visual inspection or otherwise, and Carrier covenants and agrees that such information shall not be disclosed by Carrier or any officer, employee or agent of Carrier to any third party or used in any manner without the Shipper's consent, during the term hereof and for a period of one (1) year thereafter.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

SHIPPER:

STONE CONTAINER CORPORATION
401 Alton Street
Alton, Illinois 62002

By: _____
Director of Traffic

SHIPPER:

JEFFERSON SMURFIT CORPORATION (U.S.)
401 Alton Street
Alton, Illinois 62002

By: _____
Director of Traffic

CARRIER:

SYSTEM FREIGHT, INC.

By: _____
Title: E.V.P.

Initialed by: _____  _____
Date: _____  4/10/a

5

## EXHIBIT A
### To the JEFFERSON SMURFIT CORPORATION (U.S.)
### And STONE CONTAINER CORPORATION
### MOTOR CONTRACT CARRIER AGREEMENT NUMBER _____

The term "Motor Contract Carrier" as used within this Agreement is intended to mean "Dedicated Fleet Motor Contract Carrier", meaning that the Carrier is providing the Shipper with a specified number of vehicles to perform services exclusively for the Shipper.

The Carrier will provide transportation services from the Shipper's plant located at 74 Pickering Street, Portland, Connecticut 06480 to points and places within a 260 mile radius of the plant. The Shipper agrees to tender all shipments destined to points within 260 miles of the plant to the Carrier, which are not picked up by consignee's designated trucks. In 1999, the Shipper shipped over 6,000 loads, 4,200 of which were hauled on the Carrier's dedicated equipment. Provided that the Shipper has the loads to ship and the consignees haven't designated other carriers to pick them up, the Shipper agrees to guarantee the Carrier a minimum of 3000 loads per contract year or pay the Carrier $75.00 for each load not hauled below the minimum of 3000 loads.

Paragraph 2 is modified: 6 tractors and 65 semi trailers will be dedicated to this contract.
Paragraph 4 is modified: except as provided for in Exhibit C
Paragraph 6 is modified: the Carrier may self insure cargo liability for corrugated materials
Paragraph 7 is modified: Indemnification of the agreement is superceded by the following: Indemnification (a). By the Carrier: The Carrier covenants and agrees to indemnify, defend and save harmless the Shipper, its employees, officers and agents from and against any and all claims brought against the Shipper and liabilities incurred by shipper (i) for or on account of bodily injury (including death) or property damage, other than cargo, caused by or resulting from the negligent act or omission of the Carrier, its employees or agents, in performing its obligations hereunder, (ii) arising out of the breach by the Carrier of any of the representations made by the Carrier in this Agreement; or (iii) arising out of the failure of the Carrier to comply with the requirements of governmental authorities. In the event any such claim is asserted against the Shipper, the Shipper shall tender such claim to the Carrier. Notwithstanding the foregoing indemnity of the Carrier, nothing contained herein shall relieve the Shipper of any liability caused by the willful misconduct or negligence of the Shipper, its agents or employees, or any failure on the part of the Shipper to fulfill its obligations under this Agreement. (b). By the Shipper. The Shipper covenants and agrees to indemnify, defend and save harmless the Carrier, its employees, officers and agents, from and against any and all claims brought against the Carrier and any and all liabilities incurred by the Carrier (i) for or on account of bodily injury (including death) or property damage to persons caused by or resulting from the negligent act or omission of the Shipper, its employees or agents in performing its obligations hereunder; (ii) arising out of the breach by the Shipper of any of the representations made by the Shipper in this Agreement; or (iii) arising out of the failure of the Shipper to comply with the requirements of governmental authorities. In the event any such claim is asserted against the Carrier, the Carrier shall tender such claim to the Shipper. Notwithstanding the foregoing indemnity of the Shipper, nothing contained herein shall relieve the Carrier of any liability caused by the willful misconduct or negligence of the Carrier, its agents or employees, or any failure on the part of the Carrier to fulfill its obligations under this Agreement. Indemnification hereunder shall extend to, but not limited to, personal injury, property damage, damage to vehicles or cargo loss by loading or unloading performed by the Shipper.
Paragraph 11 is modified as follows: PCMiler Version 13, and subsequent future versions may be used in lieu of Rand McNally Mile maker.
Paragraph 17 is modified: Both parties intend this to be a 3 year agreement beginning on April 1, 2000 and ending on March 31, 2003. This agreement may be terminated by the Shipper without penalty only for the following reasons and after giving the Carrier 60 day advance written notice a) condition outlined in paragraph 20; b) by mutual written agreement of both parties; c) in the event of poor service performance by the Carrier, subject to circumstances beyond the Carrier's reasonable control, including delays and other problems caused by the Shipper in providing shipments to be delivered hereunder. The Carrier will manage its operations in a manner designed to prevent a continuous pattern of missed deliveries. In the event of performance default, the Shipper will notify the Carrier, in writing, of the nature, extent and details of the performance failure. The Carrier will have 30 days to cure the problem. At the end of 30 days following notice, should the Shipper deem the problem not cured, the Shipper will again notify the Carrier in writing of the conduct that the Shipper deems is a continuing performance failure and unless the Carrier cures the performance failure within 30 days, the agreement will be terminated with no penalty to the Shipper. A performance failure will not be deemed to have occurred unless said non-performance is a material and continuous service failure. Performance that meets performance standards generally acceptable in the industry shall be acceptable hereunder.

Default: Each of the following events shall constitute a default hereunder: (a) If the Shipper fails to make any payments required to be made by the Shipper hereunder and such failure continues for a period of ten (10) days after the date the Carrier has notified the Shipper of such failure (which notice may be by facsimile); or (b) If either party fails to perform any covenant or condition required to be performed by it hereunder (other than a failure by the Shipper to make payments hereunder in accordance with (a) above and such failure continues for a period of thirty (30) days after the other party has given written notice to the non-performing party of such failure. The wrongful termination of this Agreement shall be deemed a failure of performance. Time is of the essence in the performance of all terms, covenants and conditions set forth herein, neither party shall be entitled to offset any amounts it alleges are owing by the other party as a defense to a claim of non-performance or nonpayment hereunder.

Notices: All notices, requests, demands and other communications under this Agreement shall be in writing, and shall be deemed to have been duly given if delivered personally to the party to whom the notice is to be given or on the third day after the mailing, if mailed to the party to whom notice is to be given, by registered or certified mail, postage prepaid, return receipt requested, addressed as follows: To the Shipper at: SMURFIT STONE CONTAINER CORPORATION, 74 Pickering Street, Portland, CT 06480, Attention: General Manager, and to the Carrier at: SYSTEM FREIGHT, INC. PO Box 554, Jamesburg, NJ 08831, Attention: President. Any party may change the address to which notices shall be mailed by a notice forwarding as herein provided at least ten (10) days prior to the effective date of such change of address.

SHIPPER:

JEFFERSON SMURFIT CORPORATION (U.S.)
401 Alton Street
Alton, IL 62002
By: _____
Director of Traffic
Date: 4/29/00

STONE CONTAINER CORPORATION
401 Alton Street
Alton, IL 62002
By: _____
Director of Traffic
Date: 4/29/00

CARRIER:

SYSTEM FREIGHT, INC.
PO Box 554
Jamesburg, NJ 08831
By: _____
Title
Date: 4/30/00

By: _____
Title
Date: _____

SYSTEM FREIGHT, INC. (Carrier) AND SMURFIT STONE CONTAINER, UNCASVILLE, CT (Shipper)
Trucking Agreement Dated July 1, 2000

Page 1 of 3

|    | Vehicle Number | Date of Delivery | Year & Make | Model & Type | Serial Number | Mfg Rec Max GCW and/or GVW | Agreed Cost | Estimated Annual Mileage |
|----|----------------|------------------|-------------|--------------|---------------|----------------------------|-------------|--------------------------|
| 1  | 2051 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 2  | 2052 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 3  | 2053 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 4  | 2054 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 5  | 2055 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 6  | 2056 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 7  | 2057 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 8  | 2058 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 9  | 2059 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 10 | 2060 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 11 | 2061 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 12 | 2062 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 13 | 2063 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 14 | 2064 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 15 | 2065 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 16 | 2066 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 17 | 2067 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 18 | 2068 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 19 | 2069 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 20 | 2070 | 8/00 | 2001 Mack | CH613 | TBA | 80,000 | $77,174.42 | 150,000 |
| 21 | 531451 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 22 | 531453 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 23 | 531452 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 24 | 531454 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 25 | 531455 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 26 | 531456 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 27 | 531457 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 28 | 531458 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 29 | 531459 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 30 | 531460 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 31 | 531461 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 32 | 531462 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 33 | 531463 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 34 | 531464 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 35 | 531465 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 36 | 531466 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 37 | 531467 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 38 | 531468 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 39 | 531469 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 40 | 531470 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 41 | 531471 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 42 | 531472 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 43 | 531473 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 44 | 531474 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 45 | 531475 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 46 | 531476 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 47 | 531477 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 48 | 531478 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 49 | 531479 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |

Shipper agrees that the Carrier may substitute vehicles on this schedule with comparable vehicles in the Carrier's fleet during the normal course of managing efficient trucking operations.

7/...

SYSTEM FREIGHT, INC. (Carrier) AND SMURFIT STONE CONTAINER, UNCASVILLE, CT (Shipper)  
Trucking Agreement Dated __July 1, 2000__                                        Page 2 of 2

| # | ID | Date | Model | VIN | | | Price | Weight |
|---|----|------|-------|-----|---|---|-------|--------|
| 50 | 531480 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 51 | 531481 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 52 | 531482 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 53 | 531483 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 54 | 531484 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 55 | 531485 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 56 | 531486 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 57 | 531487 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 58 | 531488 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 59 | 531489 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 60 | 531490 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 61 | 531491 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 62 | 531492 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 63 | 531493 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 64 | 531494 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 65 | 531495 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 66 | 531496 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 67 | 531497 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 68 | 531498 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 69 | 531499 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 70 | 531500 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 71 | 531501 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 72 | 531502 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 73 | 531503 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 74 | 531504 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 75 | 531505 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 76 | 531507 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 77 | 531506 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 78 | 531508 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 79 | 531509 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 80 | 531510 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 81 | 531511 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 82 | 531512 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 83 | 531513 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 84 | 531514 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 85 | 531515 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 86 | 531516 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 87 | 531517 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 88 | 531518 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 89 | 531519 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 90 | 531520 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 91 | 531521 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 92 | 531522 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 93 | 531523 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 94 | 531524 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 95 | 531525 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 96 | 531526 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 97 | 531526 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 98 | 531527 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 99 | 531528 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |
| 100 | 531529 | 8/00 | 2000 Hyundai | V12530152JS | TBA | N/A | $26,516 | 39,500 |

Shipper agrees that the Carrier may substitute vehicles on this schedule with comparable vehicles in the Carrier's fleet during the normal course of managing efficient trucking operations.

7/27/00

**EXHIBIT "B"**

## JEFFERSON SMURFIT CORPORATION (U.S.) and STONE CONTAINER CORPORATION
### CORPORATE TRAFFIC
### 401 ALTON STREET
### ALTON, ILLINOIS 62002
### TELEPHONE (618) 463-5114

**Subsidiaries**
Dalton Paper Products, Inc.
Smurfit Newsprint Corporation
Packaging Unlimited, Inc.
Groveton Paper Board Inc.
Atlanta & St. Andrews Bay Railroad Co. (FL)
Cameo Container Corporation (IL)
Cousins Leasing Corporation (NY)
Orangeburg Trucking, Inc. (SC)
Stone Global, Inc. (DE)

**Affiliates**
Smurfit Packaging Corporation
Smurfit Paperboard, Inc.
Sequoia Pacific Voting Equipment Inc.
Laimbeer Packaging Co., L.L.C.
ORPACK-Stone Corporation
S & G Packaging Co., L.L.C.
Tradepak International, Inc.

Initialed by: _____
Date: _____

6

RE:    TRAILER INSPECTION

Jefferson Smurfit Corporation (U.S.), and Stone Container Corporation places great importance on the condition and quality of the over the road equipment we utilize for our shipments from a safety standpoint. We have developed the following criteria before accepting trailers for loading our products. We will reject trailers that do not meet our safety standards. We believe that this inspection program will help prevent trailer floor failures and possible injury.

1. Trailers must have <u>maximum</u> 12 inch centers for cross members.

2. Trailers should not exceed seven (7) years in age.
   (See manufacturers plate on the nose of the trailer).

3. Floors must be sound, with no holes, gaps or rotten boards.

4. Trailer walls must be attached to flooring, no rivets/bolts missing.

5. The walls of the trailer should not be bowed.

6. The cross members should not be bowed.

7. No holes in the roof.

8. Minimum 1 3/8" hardwood flooring.

9. Annual DOT inspection and certification.

We require our carriers to perform a quality check before placing equipment for loading at our facilities.

SHIPPER:                                    SHIPPER:

STONE CONTAINER CORPORATION                 JEFFERSON SMURFIT CORPORATION (U.S.)
401 Alton Street                            401 Alton Street
Alton, Illinois 62002                       Alton, Illinois 62002

By: _____              By: _____
    Director of Traffic                         Director of Traffic

                                            CARRIER:
                                            System Freight, Inc

                                            By: _____
                                            Title:  E.V.P.

Initialed by: _____ (MP) 4/14/00
Date: 7/5/00

7

EXHIBIT C
STONE CONTAINER CORPORATION (U.S.)
MOTOR CONTRACT CARRIER AGREEMENT NUMBER _____

RATES SCHEDULE FOR STONE CONTAINER CORPORATION
74 PICKERING STREET, PORTLAND, CT 06480
TRIP RATES ARE IN DOLLARS PER TRIP
DATED APRIL 1, 2000

These zone rates are in dollars per round trip for trailer loads of product shipped from the Stone Container plant located at Portland, CT to Stone Container customers located within 260 miles of the plant from where the shipment originates. These rates apply to each trailer pulled regardless of the amount of product loaded onto each trailer, up to a maximum shipment weight of 18 tons per trailer. These rates are inclusive of all stop off charges for multiple deliveries and/or pickups. To determine the appropriate rate for multiple stop loads, the total round trip miles will apply. Each load will have one half (1/2) hour free time at the plant before departing and one hour free time to unload at the customers. Excess time will be paid for by the shipper at the applicable excess time rate for each 15 minute period or part thereof. Switching or jockey services will be provided while at the plant by drivers as required by the shipper. The 30 minutes of free time at the plant is to enable a driver to jockey one or two trailers for the shipper at no charge before departing to deliver a load. However, when a driver is held at the plant beyond 30 minutes free time or upon returning to the plant after delivering his last load for the day, the excess time charge will apply. If the shipper requires a driver to be ordered into work to perform only jockey services, a (4) four hour minimum will apply. The carrier will accumulate all time spent at deliveries and pickups each week. One (1) hour free time per load will be credited for the total weekly loads delivered. The load credit hours will be subtracted from the total time spent at all deliveries and pickups. The excess time beyond the free time will be charged to the Shipper. A daily report will be maintained by the carrier and furnished to the shipper each week. The pull charges contained herein will be adjusted on each anniversary of the contract based upon the change in the CPI for Urban consumers NY, NJ, Northeast (all items) as published by the U.S. Department of Labor. September 1999 will be the base month.

| Zone | Round Trip Miles From Plant to Customer Based on Actual Distance by Prescribed Routes | Minimum/Maximum Charge Per Pull |
|---|---|---|
| 1 | 0-10 | 57 |
| 2 | 11-20 | 69 |
| 3 | 21-30 | 79 |
| 4 | 31-40 | 90 |
| 5 | 41-50 | 102 |
| 6 | 51-60 | 113 |
| 7 | 61-80 | 125 |
| 8 | 81-100 | 144 |
| 9 | 101-120 | 155 |
| 10 | 121-140 | 171 |
| 11 | 141-160 | 186 |
| 12 | 161-180 | 201 |
| 13 | 181-200 | 216 |
| 14 | 201-220 | 228 |
| 15 | 221-240 | 257 |
| 16 | 241-260 | 273 |
| 17 | 261-280 | 288 |
| 18 | 281-300 | 303 |
| 19 | 301-320 | 315 |
| 20 | 321-340 | 330 |
| 21 | 341-360 | 345 |
| 22 | 361-380 | 360 |
| 23 | 381-400 | 391 |
| 24 | 401-440 | 420 |
| 25 | 441-480 | 452 |
| 26 | 481-520 | 482 |

Excess time charge $8.00 per 15 minute period. Weekly recurring equipment charges are $273.00 per tractor and $55.00 per trailer for equipment listed on the Equipment Schedule and/or used in the service of the Shipper. Tolls will be advanced by the Carrier and billed to the Shipper as an additional charge supported by a schedule with the invoice. Full time jockey service, when required, will be charged at $8.00 per 15 minute period and will be inclusive of tractor charge when weekly full time jockey hours exceeds 40 hours in a week.

Fuel Cost Adjustment: Current cost of fuel is factored into the zone rates on the Rate Schedule at $1.10 per gallon (including all State and Federal road use and fuel taxes). When the Carrier's cost of fuel increases or decreases by 1¢ per gallon, the total of the weekly load charges will be increased or decreased by .001 (ten one hundredths of one percent). Vehicle Insurance Adjustment: Vehicle insurance is considered to be bodily injury or property damage insurance referred to as BI and PD or casualty coverage. Insurance is factored into the weekly tractor charge at an annual cost per tractor of $1,750. If the Carrier's insurance premium increases or decreases by $50 per vehicle, per year, the weekly tractor charge will be increased or decreased by $1.00 for each $50 change in the annual per tractor insurance cost. Any such rate adjustments will be effective on the anniversary date of the Carrier's insurance policies. Third Party Taxes: all taxes mandated after inception of this agreement by any regulatory agency to which the Carrier is subject and which effects the Carrier's cost structure will be passed through to the Shipper by adjustment to the Carrier's rates.

SHIPPER:

STONE CONTAINER CORPORATION
401 Alton Street
Alton, IL 62002

By: _____
Director of Traffic

CARRIER

SYSTEM FREIGHT, INC.
PO Box 554
Jamesburg, NJ 08831

By: _____ E.V.P.
Title:

**EXHIBIT D**
to the JEFFERSON SMURFIT CORPORATION (U.S.) and STONE CONTAINER CORPORATION (U.S.)
MOTOR CONTRACT CARRIER AGREEMENT NUMBER 0051

RATES SCHEDULE FOR JEFFERSON SMURFIT CORPORATION
75 CASCADE BLVD., MILFORD, CT 06460
TRIP RATES ARE IN DOLLARS PER TRIP
DATED JUNE 1, 2000

These zone rates are in dollars per round trip for trailer loads of product shipped from the Jefferson Smurfit plant located at Milford, CT to Jefferson Smurfit customers located within 280 miles of the plant from where the shipment originates. These rates apply to each trailer pulled regardless of the amount of product loaded onto each trailer, up to a maximum shipment weight of 18 tons per trailer. These rates are inclusive of all stop off charges for multiple deliveries and/or pickups. To determine the appropriate rate for multiple stop loads, the total round trip miles will apply. Each load will have one half (1/2) hour free time at the plant before departing and one hour free time to unload at the customers. Excess time will be paid for by the shipper at the applicable excess time rate for each 15 minute period or part thereof. Switching or jockey services will be provided while at the plant by drivers as required by the shipper. The 30 minutes of free time at the plant is to enable a driver to jockey one or two trailers for the shipper at no charge before departing to deliver a load. However, when a driver is held at the plant beyond 30 minutes free time or upon returning to the plant after delivering his last load for the day, the delay time charge will apply. If the shipper requires a driver to be ordered into work to perform only jockey services, a (4) four hour minimum will apply. The carrier will accumulate all time spent at deliveries and pickups each week. One (1) hour free time per load will be credited for the total weekly loads delivered. The load credit hours will be subtracted from the total time spent at all deliveries and pickups. The excess time beyond the free time will be charged to the Shipper. A daily report will be maintained by the carrier and furnished to the shipper each week. The pull charges contained herein will be adjusted on each anniversary of the contract based upon the change in the CPI for Urban consumers NY, NJ, Northeast (all items) as published by the U.S. Department of Labor. May 2000 will be the base month.

| Zone | Round Trip miles From Plant to Customer Based on Actual Distance by Prescribed Routes | Minimum/Maximum Charge Per Pull |
|---|---|---|
| 1 | 0-10 | 74 |
| 2 | 11-20 | 88 |
| 3 | 21-30 | 102 |
| 4 | 31-40 | 116 |
| 5 | 41-50 | 130 |
| 6 | 51-60 | 145 |
| 7 | 61-80 | 165 |
| 8 | 81-100 | 183 |
| 9 | 101-120 | 201 |
| 10 | 121-140 | 219 |
| 11 | 141-160 | 236 |
| 12 | 161-180 | 254 |
| 13 | 181-200 | 272 |
| 14 | 201-220 | 289 |
| 15 | 221-240 | 307 |
| 16 | 241-260 | 325 |
| 17 | 261-280 | 343 |
| 18 | 281-300 | 360 |
| 19 | 301-320 | 378 |
| 20 | 321-340 | 395 |
| 21 | 341-360 | 415 |
| 22 | 361-380 | 431 |
| 23 | 381-400 | 449 |
| 24 | 401-440 | 467 |
| 25 | 441-480 | 485 |
| 26 | 481-520 | 490 |

Excess time charge $9.00 per 15 minute period. Weekly recurring equipment charges are $406.00 per tractor and $85.00 per trailer for equipment listed on the Equipment Schedule and/or used in the service of the Shipper. Tolls will be advanced by the Carrier and billed to the Shipper as an additional charge supported by a schedule with the invoice. Full time jockey service, when required, will be charged at $9.00 per 15 minute period and will be inclusive of tractor charge when weekly full time jockey hours exceeds 40 hours in a week. Trailers will be shuttled between plant and West Haven warehouse at the jockey rate.

Fuel Cost Adjustment: Current cost of fuel is factored into the zone rates on the Rate Schedule at $1.50 per gallon (including all State and Federal road use and fuel taxes). When the Carriers cost of fuel increases or decreases by 1¢ per gallon, the total of the weekly load charges will be increased or decreased by .001 (ten one hundredths of one percent). Vehicle Insurance Adjustment: Vehicle insurance is considered to be bodily injury or property damage insurance referred to as BI and PD or casualty coverage. Insurance is factored into the weekly tractor charge at an annual cost per tractor of $3,200. If the Carrier's insurance premium increases or decreases by $50 per vehicle, per year, the weekly tractor charge will be increased or decreased by $1.00 for each $50 change in the annual per tractor insurance cost. Any such rate adjustments will be effective on the anniversary date of the Carrier's insurance policies. Third Party Taxes; all taxes mandated after inception of this agreement by any regulatory agency to which the Carrier is subject and which affects the Carrier's cost structure will be passed through to the Shipper by adjustment to the Carrier's rates.

SHIPPER:

JEFFERSON SMURFIT CORPORATION (U.S.)
401 Alton Street
Alton, IL 62002

By: [signature]
Title: DOT
Date: 7/5/00

CARRIER

SYSTEM FREIGHT, INC.
PO Box 554
Jamesburg, NJ 08831

By: [signature]
Title: President
Date: 9/1/00

**EXHIBIT E**
To the **JEFFERSON SMURFIT CORPORATION (U.S.)**
And **STONE CONTAINER CORPORATION**
**MOTOR CONTRACT CARRIER AGREEMENT NUMBER 0093**

The term "Motor Contract Carrier" as used within this Agreement is intended to mean "Dedicated Fleet Motor Contract Carrier", meaning that the Carrier is providing the Shipper with a specified number of vehicles to perform services exclusively for the Shipper.

The Carrier will provide transportation services from the Shipper's plant located at 75 Cascade Boulevard, Milford, CT 06460 to points and places within a 260 mile radius of the plant. The Shipper agrees to tender all shipments destined to points within 260 miles of the plant to the Carrier, which are not picked up by consignee's designated trucks. In 1999, the Shipper shipped over 4,000 loads, 3,900 of which were hauled on the Carrier's dedicated equipment. Provided that the Shipper has the loads to ship and the consignees haven't designated other carriers to pick them up, the Shipper agrees to guarantee the Carrier a minimum of 2,500 loads per contract year or pay the Carrier $75.00 for each load not hauled below the minimum of 2,500 loads.

Paragraph 2 is modified: 6 tractors and 35 semi trailers will be dedicated to this contract.
Paragraph 4 is modified: except as provided for in Exhibit E
Paragraph 6 is modified: the Carrier may self insure cargo liability for corrugated materials
Paragraph 7 is modified: Indemnification of the agreement is superceded by the following: Indemnification (a) By the Carrier: The Carrier covenants and agrees to indemnify, defend and save harmless the Shipper, its employees, officers and agents from and against any and all claims brought against the Shipper and liabilities incurred by shipper (i) for or on account of bodily injury (including death) or property damage, other than cargo, caused by or resulting from the negligent act or omission of the Carrier, its employees or agents, in performing its obligations hereunder; (ii) arising out of the breach by the Carrier of any of the representations made by the Carrier in this Agreement; or (iii) arising out of the failure of the Carrier to comply with the requirements of governmental authorities. In the event any such claim is asserted against the Shipper, the Shipper shall tender such claim to the Carrier. Notwithstanding the foregoing indemnity of the Carrier, nothing contained herein shall relieve the Shipper of any liability caused by the willful misconduct or negligence of the Shipper, its agents or employees, or any failure on the part of the Shipper to fulfill its obligations under this Agreement. (b). By the Shipper. The Shipper covenants and agrees to indemnify, defend and save harmless the Carrier, its employees, officers and agents, from and against any and all claims brought against the Carrier and any and all liabilities incurred by the Carrier (i) for or on account of bodily injury (including death) or property damage to persons caused by or resulting from the negligent act or omission of the Shipper, its employees or agents in performing its obligations hereunder; (ii) arising out of the breach by the Shipper of any of the representations made by the Shipper in this Agreement; or (iii) arising out of the failure of the Shipper to comply with the requirements of governmental authorities. In the event any such claim is asserted against the Carrier, the Carrier shall tender such claim to the Shipper. Notwithstanding the foregoing indemnity of the Shipper, nothing contained herein shall relieve the Carrier of any liability caused by the willful misconduct or negligence of the Carrier, its agents or employees, or any failure on the part of the Carrier to fulfill its obligations under this Agreement. Indemnification hereunder shall extend to, but not limited to, personal injury, property damage, damage to vehicles or cargo loss by loading or unloading performed by the Shipper.
Paragraph 11 is modified as follows: PCMiler Version 13 and subsequent future versions may be used in lieu of Rand McNally Mile maker.
Paragraph 17 is modified: Both parties intend this to be a 3 year agreement beginning on 9-1, 2000 and ending on 9-31, 2003. This agreement may be terminated by the Shipper without penalty only for the following reasons and after giving the Carrier 60 day advance written notice a) condition outlined in paragraph 20; b) by mutual written agreement of both parties; c) in the event of poor service performance by the Carrier, subject to circumstances beyond the Carrier's reasonable control, including delays and other problems caused by the Shipper in providing shipments to be delivered hereunder. The Carrier will manage its operations in a manner designed to prevent a continuous pattern of missed deliveries. In the event of performance default, the Shipper will notify the Carrier, in writing, of the nature, extent and details of the performance failure. The Carrier will have 30 days to cure the problem. At the end of 30 days following notice, should the Shipper deem the problem not cured, the Shipper will again notify the Carrier in writing of the conduct that the Shipper deems is a continuing performance failure and unless the Carrier cures the performance failure within 30 days, the agreement will be terminated with no penalty to the Shipper. A performance failure will not be deemed to have occurred unless said non-performance is a material and continuous service failure. Performance that meets performance standards generally acceptable in the industry shall be acceptable hereunder.

Default: Each of the following events shall constitute a default hereunder: (a) If the Shipper fails to make any payments required to be made by the Shipper hereunder and such failure continues for a period of ten (10) days after the date the Carrier has notified the Shipper of such failure (which notice may be by facsimile); or (b) If either party fails to perform any covenant or condition required to be performed by it hereunder (other than a failure by the Shipper to make payments hereunder in accordance with (a) above) and such failure continues for a period of thirty (30) days after the other party has given written notice to the non-performing party of such failure. The wrongful termination of this Agreement shall be deemed a failure of performance. Time is of the essence in the performance of all terms, covenants and conditions set forth herein; neither party shall be entitled to offset any amounts it alleges are owing by the other party as a defense to a claim of non-performance or nonpayment hereunder.

Notices: All notices, requests, demands and other communications under this Agreement shall be in writing, and shall be deemed to have been duly given if delivered personally to the party to whom the notice is to be given or on the third day after the mailing, if mailed to the party to whom notice is to be given, by registered or certified mail, postage prepaid, return receipt requested, addressed as follows: To the Shipper at: JEFFERSON SMURFIT CORPORATION, 75 Cascade Boulevard, Milford, CT 06460, Attention: General Manager, and JEFFERSON SMURFIT CORPORATION, 401 Alton Street, Alton, IL 62002, and to the Carrier at: SYSTEM FREIGHT, INC. PO Box 554, Jamesburg, NJ 08831, Attention: President. Any party may change the address to which notices shall be mailed by a notice forwarding as herein provided at least ten (10) days prior to the effective date of such change of address.

SHIPPER:

JEFFERSON SMURFIT CORPORATION (U.S.)
401 Alton Street
Alton, IL 62002

By: _____
Title: _____
Date: 7/5/00

CARRIER:

SYSTEM FREIGHT, INC.
PO Box 554
Jamesburg, NJ 08831

By: _____
Title: President
Date: 9/1/00

EXHIBIT H
STONE CONTAINER CORPORATION (U.S.)
MOTOR CONTRACT CARRIER AGREEMENT NUMBER. 0093

RATES SCHEDULE FOR STONE CONTAINER CORPORATION
DEPOT ROAD, UNCASVILLE, CT 06382
TRIP RATES ARE IN DOLLARS PER TRIP
DATED JULY 1, 2000

These zone rates are in dollars per trip for trailer loads of product shipped from the Stone Container mill located at Uncasville, CT and other locations designated by the shipper to customers located in the states of NY, PA, and NJ. These rates apply to each trailer pulled regardless of the amount of product loaded onto each trailer, up to a maximum weight of 22 tons per trailer. Each load will have one hour free time to unload at the customers. Excess time will be paid for by the shipper at the applicable excess time rate for each 15 minute period or part thereof. The carrier will accumulate all time spent at deliveries and pickups each week. One (1) hour free time per load will be credited for the total weekly loads delivered. The load credit hours will be subtracted from the total time spent at all deliveries and pickups. The excess time beyond the free time will be charged to the Shipper. A daily report will be maintained by the carrier and furnished to the shipper each week. The pull charges contained herein will be adjusted on each anniversary of the contract based upon the change in the CPI for Urban Consumers NY, NJ, Northeast (all items) as published by the U.S. Department of Labor. June 2000 will be the base month.

| Zone | One Way Miles From Origin to Destination Based on Actual Distance by Prescribed Routes | Minimum/Maximum Charge Per Pull |
|---|---|---|
| 1 | 0-50 | 75 |
| 2 | 51-75 | 105 |
| 3 | 76-100 | 135 |
| 4 | 101-125 | 164 |
| 5 | 126-150 | 197 |
| 6 | 151-175 | 230 |
| 7 | 176-200 | 263 |
| 8 | 201-225 | 296 |
| 9 | 226-250 | 329 |

Excess time charge $7.00 per 15 minute period. Weekly recurring equipment charges are $400.00 per tractor and $65.00 per trailer for equipment listed on the Equipment Schedule and/or used in the service of the Shipper. Tolls will be advanced by the Carrier and billed to the Shipper as an additional charge supported by a schedule with the invoice. Full time jockey service, when required, will be charged at $7.00 per 15 minute period and will be inclusive of tractor charge when weekly full time jockey hours exceeds 50 hours in a week. When the Carrier is required to travel circuitous miles, the Carrier will bill these miles at $1.25 each. It is understood and agreed by the Shipper and Carrier that all freight revenue billed to and paid under this Agreement are not subject to any discounts, rebates, refunds, credits or other programs currently participated in by other Smurfit Stone Corporation operations.

Fuel Cost Adjustment: Current cost of fuel is factored into the zone rates on the Rate Schedule at $1.50 per gallon (including State, Federal road use, fuel, and other taxes). When the Carrier's cost of fuel increases or decreases by 1¢ per gallon, the total of the weekly load charges will be increased or decreased by .0144. Vehicle Insurance Adjustment: Vehicle insurance is considered to be bodily injury or property damage insurance referred to as BI and PD or casualty coverage. Insurance is factored into the weekly tractor charge at an annual cost per tractor of $5,200. If the Carrier's insurance premium increases or decreases by $50 per vehicle, per year, the weekly tractor charge will be increased or decreased by $1.00 for each $50 change in the annual per tractor insurance cost. Any such rate adjustments will be effective on the anniversary date of Carrier's insurance policies. Third Party Taxes: all taxes mandated after inception of this agreement by any regulatory agency to which the Carrier is subject and which affect the Carrier's cost structure will be passed through to the Shipper by adjustment to the Carrier's rates.

SHIPPER:

STONE CONTAINER CORPORATION
PO Box 1500
Uncasville, CT 06382

By: _____
Title: DIRECTOR OF TRANSPORTATION

CARRIER

SYSTEM FREIGHT, INC.
PO Box 554
Jamesburg, NJ 08831

By: _____
Title: _____

7/27/00

<u>EXHIBIT I</u>
To the JEFFERSON SMURFIT CORPORATION (U.S.)
And STONE CONTAINER CORPORATION
MOTOR CONTRACT CARRIER AGREEMENT NUMBER __0093__

The term "Motor Contract Carrier" as used within this Agreement is intended to mean "Dedicated Fleet Motor Contract Carrier", meaning that the Carrier is providing the Shipper with a specified number of vehicles to perform services exclusively for the Shipper.

The Carrier will provide transportation services to and from the Shipper's mill located at Depot Road, Uncasville, CT 06382 and the Rand Whitney Mill located in Montville, CT, to certain points and places within the states of NY, PA, and NJ. The Shipper agrees to tender shipments destined to and from these points to the Carrier. In 1999, the Shipper shipped over 25,000 loads on the Carrier's dedicated equipment. Provided that the Shipper has the loads to ship, the Shipper agrees to guarantee the Carrier a minimum of 18,000 loads per contract year or pay the Carrier $75.00 for each load not hauled below the minimum of 18,000 loads.

Paragraph 2 is modified: 20 tandem tractors and 80 semi trailers will be dedicated to this contract.
Paragraph 4 is modified: except as provided for in Exhibit I.
Paragraph 6 is modified: the Carrier may self insure cargo liability for rolls of paper.
Paragraph 7 is modified: Indemnification of the agreement is superceded by the following: Indemnification (a). By the Carrier: The Carrier covenants and agrees to indemnify, defend and save harmless the Shipper, its employees, officers and agents from and against any and all claims brought against the Shipper and liabilities incurred by shipper (i) for or on account of bodily injury (including death) or property damage, other than cargo, caused by or resulting from the negligent act or omission of the Carrier, its employees or agents, in performing its obligations hereunder; (ii) arising out of the breach by the Carrier of any of the representations made by the Carrier in this Agreement; or (iii) arising out of the failure of the Carrier to comply with the requirements of governmental authorities. In the event any such claim is asserted against the Shipper, the Shipper shall tender such claim to the Carrier. Notwithstanding the foregoing indemnity of the Carrier, nothing contained herein shall relieve the Shipper of any liability caused by the willful misconduct or negligence of the Shipper, its agents or employees, or any failure on the part of the Shipper to fulfill its obligations under this Agreement. (b). By the Shipper. The Shipper covenants and agrees to indemnify, defend and save harmless the Carrier, its employees, officers and agents, from and against any and all claims brought against the Carrier and any and all liabilities incurred by the Carrier (i) for or on account of bodily injury (including death) or property damage to persons caused by or resulting from the negligent act or omission of the Shipper, its employees or agents in performing its obligations hereunder; (ii) arising out of the breach by the Shipper of any of the representations made by the Shipper in this Agreement; or (iii) arising out of the failure of the Shipper to comply with the requirements of governmental authorities. In the event any such claim is asserted against the Carrier, the Carrier shall tender such claim to the Shipper. Notwithstanding the foregoing indemnity of the Shipper, nothing contained herein shall relieve the Carrier of any liability caused by the willful misconduct or negligence of the Carrier, its agents or employees, or any failure on the part of the Carrier to fulfill its obligations under this Agreement. Indemnification hereunder shall extend to, but not limited to, personal injury, property damage, damage to vehicles or cargo loss by loading or unloading performed by the Shipper.
Paragraph 11 is modified as follows: PCMiler Version 13 and subsequent future versions may be used in lieu of Rand McNally Mile maker.
Paragraph 17 is modified: Both parties intend this to be a 3 year agreement beginning on July 1, 2000 and ending on June 30, 2003. This agreement may be terminated by the Shipper without penalty only for the following reasons and after giving the Carrier 60 day advance written notice a) condition outlined in paragraph 20; b) by mutual written agreement of both parties; c) in the event of poor service performance by the Carrier, subject to circumstances beyond the Carrier's reasonable control, including delays and other problems caused by the Shipper in providing shipments to be delivered hereunder. The Carrier will manage its operations in a manner designed to prevent a continuous pattern of missed deliveries. In the event of performance default, the Shipper will notify the Carrier, in writing, of the nature, extent and details of the performance failure. The Carrier will have 30 days to cure the problem. At the end of 30 days following notice, should the Shipper deem the problem not cured, the Shipper will again notify the Carrier in writing of the conduct that the Shipper deems is a continuing performance failure and unless the Carrier cures the performance failure within 30 days, the agreement will be terminated with no penalty to the Shipper. A performance failure will not be deemed to have occurred unless said non-performance is a material and continuous service failure. Performance that meets performance standards generally acceptable in the industry shall be acceptable hereunder.

Default: Each of the following events shall constitute a default hereunder: (a) If the Shipper fails to make any payments required to be made by the Shipper hereunder and such failure continues for a period of ten (10) days after the date the Carrier has notified the Shipper of such failure (which notice may be by facsimile); or (b) If either party fails to perform any covenant or condition required to be performed by it hereunder (other than a failure by the Shipper to make payments hereunder in accordance with (a) above and such failure continues for a period of thirty (30) days after the other party has given written notice to the non-performing party of such failure. The wrongful termination of this Agreement shall be deemed a failure of performance. Time is of the essence in the performance of all terms, covenants and conditions set forth herein, neither party shall be entitled to offset any amounts it alleges are owing by the other party as a defense to a claim of non-performance or nonpayment hereunder.

Notices: All notices, requests, demands and other communications under this Agreement shall be in writing, and shall be deemed to have been duly given if delivered personally to the party to whom the notice is to be given or on the third day after the mailing, if mailed to the party to whom notice is to be given, by registered or certified mail, postage prepaid, return receipt requested, addressed as follows: To the Shipper at: SMURFIT STONE CORPORATION, PO Box 1500, Uncasville, CT 06382 Attention: General Manager, and to the Carrier at: SYSTEM FREIGHT, INC. PO Box 554, Jamesburg, NJ 08831, Attention: President. Any party may change the address to which notices shall be mailed by a notice forwarding as herein provided at least ten (10) days prior to the effective date of such change of address.

SHIPPER:

SMURFIT STONE CORPORATION
PO Box 1500
Uncasville, CT 06382

By: _Danny P Scott_
Title: _DIRECTOR OF TRANSPORTATION_

Date: _8/1/00_

CARRIER:

SYSTEM FREIGHT, INC.
PO Box 554
Jamesburg, NJ 08831

By: _____
Title

Date: _____

7/27/00